UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,    : 15-cr-00348-ERK
                             :
     - versus -              : U.S. Courthouse
                             : Brooklyn, New York
                             :
ODILON MARTINEZ-ROJAS,        :
AND SEVERIANO MARTINEZ-ROJAS, : January 4, 2019
          Defendants         : 3:24 PM
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

**For the Government**:        **Richard Donoghue, Esq.**
                              United States Attorney

                         BY: **Margaret Lee, Esq.**
                              **Taryn Merkl, Esq.**
                              Assistant U.S. Attorney
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


**For Defendant**
**Odilon Martinez-Rojas**:     **Richard Rosenberg, Esq.**
                              217 Broadway
                              Suite 707
                              New York, NY 10007

**Severiano Martinez-Rojas**:  **John Wallenstein, Esq.**
                              1100 Franklin Ave
                              Garden City, NY 11530




**Transcription Service**:     **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  United States v. Odilon Martinez-

2    Rojas and Severiano Martinez-Rojas.

3          Your appearances, counsel.

4          MR. ROSENBERG:  Yes.  Good afternoon, your

5    Honor.

6          For Mr. Odilon Martinez-Rojas, Richard

7    Rosenberg.

8          MR. WALLENSTEIN:  And for Severiano Martinez-

9    Rojas, John Wallenstein.

10          Good afternoon, your Honor.

11          THE COURT:  I'm going to sentence them

12    separately, but Paula's called you together because

13    there's apparently a common issue.

14          MS. MERKL:  Your Honor, that's the government's

15    understanding.  Before we get into that, I will just note

16    the government's appearance, Taryn Merkl and Maggie Lee

17    for the United States.  And the probation officers

18    present.

19          MS. SULLIVAN:  Patricia Sullivan.

20          Good afternoon, your Honor.

21          MS. METTS:  Miriam Metts.

22          MR. GJELAJ:  Mark Gjelaj.

23          Good afternoon, your Honor.

24          MS. MERKL:  And your Honor, my understanding

25    based on discussions with counsel prior to proceeding is

3

Proceedings

1  that some of the guideline's calculations as to these two

2  defendants are the same because a lot of overlapping

3  conduct in which they were engaged involving the same

4  Jane Does.

5           There are some challenges, is my understanding,

6  to the vulnerable victim enhancement in particular but I

7  will, of course, let the defense attorneys speak for

8  themselves.

9           THE COURT:  Okay.

10          MR. ROSENBERG:  Yes.

11          THE CLERK:  First things, Judge, the magistrate

12  took the plea for both of these defendants.  As long as

13  it's okay with each of your clients, I am going to refer

14  to them by their first names.

15          MR. WALLENSTEIN:  Fine, it makes it easier.

16          MR. ROSENBERG:  That's fine.

17          THE CLERK:  Okay.  So Judge, for Odilon

18  Martinez-Rojas, the magistrate took the plea, and also

19  Severiano, as well --

20          THE COURT:  Okay.

21          THE CLERK:  -- the magistrate took the plea.

22          THE COURT:  I would accept the plea based on my

23  reading of the plea minutes but for the same reasons as

24  I've asked the other lawyers, so I just want to be sure,

25  this is a complex case, particularly the sentencing, and

4

                              Proceedings

1   I want to be sure that -- first of all, the presentence

2   report, has that been translated?

3                MR. ROSENBERG:  It has been, your Honor.

4                THE COURT:  And you've gone over it with the

5   defendant?

6                MR. ROSENBERG:  Yes, your Honor.

7                THE COURT:  And before he pled, you went over

8   the manner in which the sentence would be calculated?

9                MR. ROSENBERG:  Yes, your Honor.

10               THE COURT:  And the guidelines?

11               MR. ROSENBERG:  We went through -- the

12  agreement was translated into Spanish, and went through

13  the PSR, and we went through the sentencing calculations.

14               THE COURT:  And --

15               MR. WALLENSTEIN:  And your Honor, for

16  Severiano, the PSR was translated into Spanish for him.

17  In fact, so just so the record is completely clear, the

18  conduct portion of the PSR which encompassed all

19  defendants was translated and shared with all of my co-

20  counsel when that was done.

21               I reviewed the PSR with Severiano, with an

22  interpreter, and he has a copy of it in Spanish.  The

23  same applies to the indictment and the plea agreement,

24  which were reviewed prior to the plea before the

25  magistrate.

5

                    Proceedings

1          THE COURT:  And you've gone over with him

2    carefully, the manner in which the guidelines have been

3    calculated?

4          MR. WALLENSTEIN:  Yes, sir.

5          THE COURT:  And he understand what the maximum

6    sentence is?

7          MR. WALLENSTEIN:  Yes, he does, and he

8    understands what the guidelines calculation is, and what

9    our objections to them are.

10         THE COURT:  Okay.  And that's the same --

11         MR. ROSENBERG:  That's the same here, your

12   Honor.

13         THE COURT:  Okay.

14         MR. ROSENBERG:  It's understood.

15         THE COURT:  Okay. So why don't you make your

16   objection?

17         MR. ROSENBERG:  Your Honor, this is really

18   quite straightforward, as opposed to some of the previous

19   sentences that you heard.

20         The plea agreement contains a calculation that

21   includes a vulnerable victim enhancement for Jane Does 1,

22   4, and number 9.  And we are aware of the government's

23   memorandum, and the statements of the victims that there

24   were allegations of abuse, and during the course of the

25   relationship, and during the course of offense.

6

Proceedings

1    However, there is nothing in the government's

2    proffer or in their sentencing memorandum that to me

3    indicates at least, that the McCall standard, the United

4    States v. McCall and the cases that follow, that there

5    was anything in particular about each of these victims

6    that made them particular susceptible to being recruited

7    or reduced, or targeted for this offense.

8         And I understand your Honor has ruled as to

9    Jane Doe number 6, however my client, Odilon, was not

10   charged with that in the plea agreement.  I understand

11   that the probation department considered all the victims

12   vulnerable, and that I think from your Honor's previous

13   comments, you don't necessarily accept that blanket

14   characterization.

15        THE COURT:  Right.

16        MR. ROSENBERG:  So as to Odilon, in any event,

17   those three enhancements of vulnerable victim

18   enhancements for those three victims does bump up that

19   affect the grouping analysis.  So what we come up -- and

20   I should add one thing, and I missed this originally, but

21   as to -- maybe I should just stick with Jane Does 1, 4

22   and 9, but Jane Doe 5 has a level 38 based on a minor --

23   a participant of a minor.

24        My client's -- I understand that's -- you don't

25   cut the tree and count the rings, it doesn't matter

7

Proceedings

1    whether or not a defendant knows the true age.  However,

2    I just wanted to underscore that my client's role in

3    number 5 was limited to picking her up at the airport in

4    Atlanta when she arrived in Atlanta, and taking her to

5    another location.

6             THE COURT:  Well, I thought we were dealing

7    with 1, 4, and 9.

8             MR. ROSENBERG:  But I was just --

9             THE COURT:  Don't jump around.

10            MR. ROSENBERG:  -- it affects the guidelines,

11    but --

12            THE COURT:  Let's --

13            MR. ROSENBERG:  Anyway --

14            THE COURT:  -- we're not -- we're just doing --

15            MR. ROSENBERG:  -- let's just stick to the

16    vulnerable victims for the time line.

17            THE COURT:  Yeah.

18            MR. ROSENBERG:  So again, it's our position

19    that nothing put forward to make those victims vulnerable

20    and under the case law, to be initially recruited or

21    targeted to some particular vulnerability.

22            I think the case law is Sabatino, which

23    mentions that economic duress is not a characteristic

24    that would be considered under the law to make a person a

25    vulnerable victim.  And the Mann Act is not -- as well is

8

Proceedings

1  not a character -- sufficient characterization to

2  establish vulnerability.

3            THE COURT:  So let me hear from the --

4            MR. ROSENBERG:  So it's for those reasons that

5  we --

6            THE COURT:  Let me hear from the government on

7  1.

8            MS. MERKL:  Okay.  Your Honor, with regard to

9  Jane Doe 1, the government applied the vulnerable victim

10  enhancement because she was 19-years-old when the

11  defendant, Odilon Martinez-Rojas approached her to

12  recruit her.

13            And at the young age of 19, she was working in

14  a store that had three children to support, including a

15  child with medical problems.  She told Mr. Martinez-Rojas

16  repeatedly that she didn't want to leave her family, that

17  she needed to earn money for her children, who -- at

18  least one of whom required significant medical attention,

19  and you know, Mr. Martinez-Rojas continued to pursue her.

20  She ultimately -- promising her a job at a restaurant

21  where she could make more money than she was making in

22  her then employment.

23            Upon being lured away from her situation, the

24  restaurant job did not materialize, and she was promptly

25  convinced to come to the United States, so that she could

9

Proceedings

1    earn enough money to care for her needy children.

2              So we do, your Honor, submit that as a 19-year-

3    old with three children to support, including one of whom

4    required substantial medical care, this defendant

5    targeted her specifically because she was desperate to

6    take care of her children, and he exploited that

7    vulnerability in, you know, inducing her or coercing her

8    to come to the United States under false pretenses.

9              I would note, your Honor, that this is the same

10   victim who was sent to work the very first day or the

11   second day after her arrival in the United States, and

12   had no idea why they took her to a place of -- to perform

13   service on clients, and she didn't understand the work.

14   She began crying.

15             The driver brought her back to Odilon to

16   address the situation and he beat her, raped her, held

17   her in captivity essentially, until she agreed to work.

18             So she was, you know, lured away under grossly

19   false pretenses due to her susceptibility as a result of

20   having some -- a more desperate economic circumstance

21   than usual.  She was not merely a poor person trying to

22   find for herself, but a poor person who was trying to

23   take care of her three children with limited economic

24   opportunities where she was living at the time.

25             With regard to Jane Doe 4, your Honor, the

10

Proceedings

1  government applied the vulnerable victim enhancement in

2  that instance largely, your Honor, due to the fact that

3  it was --

4          THE COURT:  Well, let's finish with 1, and then

5  we can go on.

6          MS. MERKL:  I'm sorry.

7          THE COURT:  Let's finish with 1.

8          MR. ROSENBERG:  Well again, your Honor that --

9          THE COURT:  The fact that she is 19, it seems

10  to me, she's already -- he's already getting -- the age

11  is already being factored, as I understand it.

12          MS. MERKL:  Not with regard to this victim,

13  your Honor.  Age is --

14          THE COURT:  No, not with regard to this victim

15  in general, but I thought you -- I thought -- I don't

16  know.  I maybe sentencing too many people at once.  I

17  thought you said that age was a factor in one of these

18  calculations.

19          MS. MERKL:  Only as to the minor's risk.  Once

20  somebody reaches the age of 18, they're treated as an

21  adult --

22          THE COURT:  Right.

23          MS. MERKL:  -- for the purposes of sex

24  trafficking.  So there's no enhancement other than the

25  vulnerable victim.

11

Proceedings

1          THE COURT:  Right.  So then you've emphasized
2    it -- that's what I thought but you've emphasized the 19.
3          MS. MERKL:  Just because she's very young with
4    substantial weight on her shoulders, your Honor.
5          MR. ROSENBERG:  Well again, your Honor, those
6    are factors that have been considered by our Circuit and
7    rejected in McCall and rejected in Sabatino, and in
8    United States v. Castaneda, 239 F.3d 978, (9th Cir.)case,
9    which is a Mann Act but it's -- Sabatino was a First
10   Circuit case.
11         You have the cases that I've cited in my memo,
12   and McCall, that -- look, the fact that she was young and
13   economically desperate lent itself to the crime itself.
14   That's already -- that's part of what he's charged with
15   in sex trafficking.
16         But I think it's a stretch to say that those
17   factors made her particularly vulnerable, more targeted
18   for those reasons, and I think that's contrary to what
19   the law in this circuit and other circuits states.
20         And Ms. Merkl mentioned the abuse that was
21   rendered her by my client as a further explanation for
22   vulnerability, but I think that's after the fact.  We're
23   talking about what conduced her, and what made her
24   specifically, and particularly vulnerable to begin with.
25         MS. MERKL:  Your Honor, we spent a lot of time

12

Proceedings

1    yesterday talking about vulnerability --

2           MR. ROSENBERG:  Yes.

3           MS. MERKL:  -- in general versus targeting, and

4    this victim was vulnerable.  She had a tremendous amount

5    of weight on her shoulders for someone of such a young

6    age, and the government submits respectfully that that is

7    what's relevant, not whether this defendant targeted her

8    for that reason.  Again, the targeting is not the

9    standard.

10          THE COURT:  Well, according to the presentence

11   report, he offered her a job which she didn't immediately

12   accept, and it was somewhat about a year later that he

13   telephoned and asked her to be his girlfriend.

14          And it's not clear to me, when was the offer of

15   a job made?

16          MS. MERKL:  Your Honor, my understanding based

17   on the extradition paperwork, and the plea agreement -- I

18   mean, and the PSR, excuse me, was that the restaurant job

19   offer came after he had been kind of telephoning her for

20   up to a year, in learning about her personal

21   circumstances and her desperate need for income.

22          MR. ROSENBERG:  Well again, that's more in

23   terms of the crime itself of sex trafficking, and false

24   promises, which is part of the overarching offense of sex

25   trafficking.  It's already been accounted for.

Transcriptions Plus II, Inc.

13

Proceedings

1    THE COURT:  Well, the probation report says

2  that Jane Doe traveled to Pueblo to accept Odilon's offer

3  to work in the restaurant.  And she arrived, he told her

4  that the restaurant was no longer in operation, and he

5  offered to bring her to the United States to make even

6  more money.

7    The government's argument is that she was

8  particular vulnerable because she had sick children who

9  needed medical treatment.  It's not just that she was

10  poor.

11    MR. ROSENBERG:  I don't think that economic

12  duress is necessarily standard for vulnerability, your

13  Honor.  That's the Sabatino case at 943 F.2d 94, (1st

14  Cir. 1991).

15    MS. MERKL:  Sabatino is clearly not on all

16  fours with this particular victim's circumstances, your

17  Honor.

18    THE COURT:  I read McCall but I don't know --

19  where is Sabatino?  I don't have that.

20    MR. ROSENBERG:  What's the citation 943 F. 2d

21  94.

22    THE COURT:  Can somebody -- can you get it for

23  me?

24    MR. ROSENBERG:  I'm sorry, I don't have the

25  case with me, Judge.

14

Proceedings

1            THE COURT:  Just get me the case.

2            Okay, let's go onto the next one, 4.

3            MS. MERKL:  Your Honor, Jane Doe 4, the

4    application of Jane Doe 4 was also made due to her sort

5    of unusual personal circumstances.  She was living in

6    Guatemala when she was targeted, and in an abusive

7    relationship, and sort of desperate to leave Guatemala.

8            And she was introduced to Odilon Martinez-

9    Rojas, who you know sort of promised to be her boyfriend,

10    and sort of rescue her from this abusive situation, and

11    help her leave her bad situation in Guatemala.

12            I would note, your Honor, that the Court in

13    Georgia did find vulnerable victim as to this defendant

14    in the underlying case.  Mr. Martinez-Rojas is already

15    sentenced as to Jane Doe 4 in Georgia.

16            MR. WALLENSTEIN:  But Severiano has not been.

17            MR. ROSENBERG:  That's correct.

18    (Pause)

19            THE COURT:  And did he know he was in this

20    abusive relationship?

21            MS. MERKL:  Your Honor, the government

22    certainly believes that the evidence suggests that she

23    expressed her concerns to this defendant in order to get

24    out of her situation, and he offered to be her boyfriend

25    and rescue her from this terrible situation she was in.

15

Proceedings

1          MR. ROSENBERG:  Well again, you know, that's
2   totally speculative, your Honor, as to what my client --
3          THE COURT:  No, but the way the presentence
4   report is worded is that at the time that she met a
5   Mexican national individual in 2007, she told that the
6   individual she was involved in an abusive relationship
7   and she wanted to leave Guatemala and enter the United
8   States.  And he provided Jane Doe information to contact
9   Odilon.
10          MS. MERKL:  Your Honor, I would also note that
11   in contrast to Jane Doe 6, who was first subjected to the
12   prostitution work in Mexico, both of these women were
13   duped into coming to the United States under these
14   entirely false pretenses, and once here in the United
15   States and isolated from friends and family --
16          THE COURT:  No, no, but what made them
17   particularly vulnerable.
18          MS. MERKL:  All of those things --
19          THE COURT:  No, what made -- the question that
20   I asked is did Odilon know that she was involved in an
21   abusive relationship.
22          MS. MERKL:  Your Honor, that is the
23   government's understanding of the facts.
24          THE COURT:  No, but that's your understanding
25   based on --

Proceedings

1      MS. MERKL:  Based on the debriefings, and based

2  on her explanation of how she came to meet him.  She was

3  introduced by this friend who knew she was in an abusive

4  relationship, and trying to get out of it.  That's my

5  understanding but obviously, we can pull the reports and

6  take time to (indiscernible) down.

7      MR. ROSENBERG:  Judge, I submit that's kind of

8  a low standard, the fact that she had bad relationship

9  going on in her life, and her --

10      MS. MERKL:  But --

11      MR. ROSENBERG:  And again, there's nothing

12  specific to show that my client knew that or that was the

13  main reason that she even agreed to be his girlfriend.

14      MS. MERKL:  Your Honor, if I may just briefly

15  -- it is also significant, we believe, that these girls

16  were lured out of their home countries and then subjected

17  to this type of work because once isolated in a country

18  where they don't speak the language, and don't have any

19  money --

20      THE COURT:  But according to this, she wanted

21  to.

22      MS. MERKL:  She wanted to leave --

23      THE COURT:  She wanted to leave --

24      MS. MERKL:  -- but she didn't want to come here

25  to be a prostitute, your Honor.

17
Proceedings

1       THE COURT:  No, I understand that.  I'm just --

2       MS. MERKL:  And once here, she is more

3  vulnerable than she would've been in a place where she

4  had a social network, a parent, or a friend, or a family

5  member to call.  She had nobody to call when they brought

6  her to Georgia.  She doesn't speak any English.  She had

7  no money, no resources whatsoever.  The defendant

8  essentially isolated these women from their social

9  network by bringing them into the United States under

10  false pretenses.

11       Once here, no knowledge that they were being

12  brought here to do prostitution-related work were very,

13  very vulnerable, because they were -- had no safety net,

14  and absolutely no resources available to them.

15       MR. ROSENBERG:  This sounds more like

16  probation's approach, blanket approach to each of the

17  victims in this case.  All of them were induced one way

18  or another.

19       THE COURT:  No.

20       MS. MERKL:  Your Honor, not all of them were

21  forced into prostitution once isolated and brought to the

22  U.S.  Some of them were required to work in Mexico.

23  Those women were not -- they had their eyes a little bit

24  more open as to what was in store for them in the United

25  States.

18

Proceedings

1        I would note that as to Jane Doe 5 for example,

2   who ended up working in Mexico before coming here, the

3   government has not sought the vulnerable enhancement as

4   to her for any defendant.

5        THE COURT:  Okay.  So she was vulnerable, so

6   that I understand it.  So she was vulnerable because she

7   was in the United States, and it was in the United States

8   that she was forced to engage in prostitution, and as a

9   consequence, she was vulnerable because there was nothing

10  -- there was no way for her to get out of it.

11       MS. MERKL:  That's part of the government's

12  argument.  We also believe the background circumstances

13  matter but the being here is significant, significant

14  break in her ability to get out.

15       MR. WALLENSTEIN:  But Judge, my understanding

16  is that the government's argument initially was that this

17  was a vulnerable victim, and this applies to the others,

18  as well, at the time that she was targeted, and Severiano

19  had nothing to do with that.  He doesn't come into the

20  picture until much later on.

21       But if their position is that she was targeted

22  because she was a vulnerable person, the creation of

23  vulnerability later is inapplicable, as I see it --

24       THE COURT:  Well, I have to take --

25       MR. WALLENSTEIN:  -- and isn't that really the

19

Proceedings

1  essence of the crime itself, and therefore built into the

2  base guideline, that you brought somebody here for the

3  purpose of isolating them and having them prostitute

4  themselves.

5          THE COURT:  Well, I don't know --

6          MR. WALLENSTEIN:  That's what sex trafficking

7  is all about.

8          MS. MERKL:  I think there's a scale of

9  vulnerability.

10          THE COURT:  What is the guidelines again?

11          MS. MERKL:  3A1.1, your Honor.  And your Honor,

12  our argument is essentially the same as to 7 with regard

13  to her isolation and --

14          THE COURT:  Just, I can't --

15          MS. MERKL:  I understand.

16          THE COURT:  I can't listen and read at the same

17  time.  3A, what did you say?

18          MS. MERKL:  1.1.

19          THE COURT:  I don't see where that -- where you

20  get the argument under the note that she has to have been

21  targeted --

22          MR. WALLENSTEIN:  My argument is that the --

23          THE COURT:  -- initially.

24          MR. WALLENSTEIN:  -- the government's argument

25  is that they were targeted because they were vulnerable,

20

Proceedings

1    that they exploited their vulnerability initially by

2    targeting a woman with young children, and a sick child,

3    a woman in an abusive relationship.  That's the

4    government's argument.  And what I'm saying is --

5              THE COURT:  Right, the government has made

6    another argument.

7              MR. WALLENSTEIN:  Well, that's the way I heard

8    their argument.  Maybe I missed it.

9              THE COURT:  Well --

10             MR. WALLENSTEIN:  And I'm suggesting that if

11   that is the argument, that's one thing, and Mr. Rosenberg

12   has addressed this, but if that is their argument, then

13   the fact that they became vulnerable once they were here

14   is a separate argument, and I don't think it's applicable

15   here, and it's certainly not applicable for Severiano,

16   who doesn't even know about Jane Doe 4 until way down the

17   road, and then only for a short period of time.

18             MR. ROSENBERG:  Again, your Honor, I think this

19   is -- the crime itself is the fact that the person was

20   induced for -- by pretenses, false pretenses, force to

21   otherwise, coercion, into engaging in prostitution

22   against their will, and there's nothing that I've heard

23   that makes this victim particularly vulnerable as an

24   individual to be beyond induced.  Again, it's more akin

25   to the probation's approach that they're all vulnerable,

21

Proceedings

1  because they're all poor, and they're all in desperate

2  situations, and your Honor has already rejected that and

3  I think the case law supports your Honor's view of that.

4          Probation says if we're not protecting a group

5  of young, poor, uneducated women from an impoverished

6  area of Mexico, who are we going to protect?  But that's

7  their generalization, and --

8          MS. MERKL:  And that is not the government's

9  generalization, your Honor.

10          MR. ROSENBERG:  That's what it comes down to

11  though.

12          MS. MERKL:  Most respectfully, it does not come

13  down to that.

14          THE COURT:  Well the government's argument is

15  that first of all, she was vulnerable because of the

16  abusive relationship, and separate and apart from that,

17  once she got to the United States, and before she had

18  engaged in forced -- in commercial prostitution, she was

19  in a position where she had no choice.

20          MR. WALLENSTEIN:  Isn't that true though --

21          THE COURT:  I mean, I had an analogous case,

22  although it didn't involve this particular crime but it

23  involved a defendant who lured women to an isolated

24  suburb of New York, I think it was Pound Ridge, and under

25  circumstances where they had no money, and no means of

22

Proceedings

1   leaving even though he told them that they were free to

2   leave, and my own view is that they were sort of

3   psychological prisoners and I don't know that I was -- I

4   took that into account in determining the sentence in

5   this -- the case was United States v. Yannai, and it

6   seems to me this is a comparable situation where she's

7   vulnerable because of the fact that she was, for all

8   practical purposes, in a position where she wasn't free

9   to leave.

10          MR. WALLENSTEIN:  But isn't that --

11          THE COURT:  Even if -- I mean in that case, he

12   told these women that they could go.  It's just the

13   question is where would they go, and that was the

14   problem.

15          MR. WALLENSTEIN:  But isn't that the essence of

16   the crime itself?  And maybe I am reading this wrong, but

17   it seems to me that the vulnerable victim enhancement is

18   designed to be a comparison of this particular victim

19   versus other victims of the same crime --

20          THE COURT:  Right.

21          MR. WALLENSTEIN:  -- in a different situation,

22   and I think that probation's position certain is that

23   every woman whose sex traffic --

24          THE COURT:  I know, we've been through it.  I

25   don't --

23

Proceedings

1      MR. WALLENSTEIN:  -- is vulnerable.

2      THE COURT:  I don't agree with it.  I said why
3  I didn't agree with probation.

4      MR. WALLENSTEIN:  I agree with your not
5  agreeing, but I just think that the comparison issue
6  eliminates the vulnerable victim enhancement in a number
7  of these women.  They are no more vulnerable than any
8  other victim of sex trafficking.  And I'm not condoning
9  that or anything else.  I'm just saying if you take all
10  the victims of sex trafficking, they're not very
11  different.

12      THE COURT:  Where is commercial sex trafficking
13  defined?

14      MS. MERKL:  Your Honor, commercial sex act is
15  defined as an exchanged act for anything of pecuniary
16  value.  It's within 1591 itself.

17      THE COURT:  Right.

18      MS. MERKL:  Your Honor, commercial sex is
19  defined in 1591(e), "Any sex act on account of which
20  anything of value is given to or received by any person."

21      MS. MERKL:  Your Honor, if I may, there is a
22  case -- I just wanted to bring to the Court's attention,
23  United States v. Monsal, 342 F.App 451 out of the 11th
24  Circuit in 2009, where vulnerable because like victims
25  that were specifically identified here, they were

24

Proceedings

1   susceptible to criminal conduct for income, spoke no

2   English, had no family in the United States, or place to

3   live other than what the defendant was providing which

4   made them, you know, unduly susceptible to being

5   pressured into the criminal conduct at issue.

6           So it's just further support for the

7   government's position that it's the isolation by bringing

8   them here with no clue what they're getting themselves

9   into that pushes them even farther down the scale of

10  vulnerability from where they already began when they

11  were targeted.

12          THE COURT:  And did he pay her anything?

13          MS. MERKL:  Your Honor, the Jane Does in this

14  case all relay that the defendants took basically all of

15  their earnings, and would even search them for any money

16  that they were trying to conceal.  At times, certain of

17  the defendants, I would have to double-check as to the

18  specific Jane Does, and these defendants would count the

19  condoms to make sure that they weren't withholding any

20  proceeds from any specific John and giving them basically

21  no ways to support themselves, other than their

22  dependency on the defendant.

23          THE COURT:  Okay.  So it would satisfy this

24  definition if the money was -- if they gave him money.

25          MS. MERKL:  I'm sorry, I couldn't hear.

25

Proceedings

1          THE COURT:  I say the definition would be
2    satisfied if the victims gave him money for what they
3    earned.
4          MS. MERKL:  That would be the financially
5    benefitting prong of sex trafficking but the commercial
6    sex act is complete the minute the money is exchanged for
7    a sex act.
8          THE COURT:  So it doesn't matter whether it was
9    the defendant who gave the money.
10          MS. MERKL:  It doesn't matter whether the
11    defendant received the money.  If the defendant harbored,
12    transported, enticed, recruited, obtained, or maintained
13    that girl, the theory of prosecution here, your Honor, is
14    based on the provision and obtaining of the girls, not
15    the financial benefit prong, although they did that, too.
16          THE COURT:  No, I am just trying to deal with
17    the definition of what -- their argument is that this is
18    all -- and this conduct is all encompassed within the
19    general umbrella of engaging in commercial sex activity,
20    and I just wanted to know what the definition was of that
21    particular offense, so I know whether it's within the
22    umbrella.
23          MS. MERKL:  Well, your Honor, I think that I
24    understood the argument to be, you know, obtaining an
25    enticing the girls, you know that the holding of them

26

Proceedings

1    essentially would be contained within the action verbs,

2    if you will, of 1591(a).

3            It's the government's position though that

4    that's part of it certainly.  You know, isolation is a

5    common tactic employed by sex traffickers, but that even

6    within the realm of victims, these victims who were in

7    sort of economic desperation situations, and then

8    completely ripped away from any social network, and their

9    home country, and completed isolated in a foreign land,

10   and then required to work in this industry, are more

11   vulnerable than women who could have perhaps gotten away

12   in their home country, spoken to the police in their

13   local language.

14           You know, we didn't make this argument as to

15   every single Jane Doe in this case.  We looked at each

16   female individually, and analyzed what happened to her,

17   and what the defendants knew about it when based on their

18   levels of interaction with those girls, and women.

19           THE COURT:  All right.  I'm persuaded by that

20   argument.  So let's go on.  What is the next?

21           MR. ROSENBERG:  So it's that you're holding it

22   vulnerable --

23           MR. WALLENSTEIN:  For which one, we're talking

24   about number 4 now?

25           THE COURT:  Number 4.

27

Proceedings

1          MR. ROSENBERG:  Number 4.  We still have number
2    1.
3          THE COURT:  Well, we have to come back to
4    number 1.  Let's do 9.  What is it --
5          MR. ROSENBERG:  9?
6          THE COURT:  Is that the third one that you're
7    talking about?  Yeah.
8          MS. MERKL:  Your Honor, that was to 1 and 4, or
9    all three?
10         MR. ROSENBERG:  Not to 1, just to 4.
11         THE COURT:  I haven't dealt with 1 yet.
12         MS. MERKL:  Just 4.
13         THE COURT:  I have to look at the case that he
14   cited.
15         MS. MERKL:  Your Honor, Jane Doe 9 is similarly
16   situated to Jane Doe 7 in that Odilon met her when she
17   was approximately 20, convinced her that they were in a
18   real relationship, and brought her across the border to
19   Georgia under the auspices of gaining -- I'm just trying
20   to read paragraph 30 of the PSR.
21         THE COURT:  I thought it was paragraph 29.  If
22   I've got the wrong -- oh, I am looking at Odilon's -- I'm
23   sorry.
24         MS. MERKL:  Oh, am I sorry, am I looking at --
25   I'm looking at Severiano's.  Yes, sir.  My apologies,

Proceedings

1   your Honor.

2           Turning to Odilon's PSR, I think it's the same

3   paragraph, just a different number, your Honor, but so as

4   to make the record clear --

5           THE COURT:  It's 29 in Odilon's.

6           MS. MERKL:  Thank you, your Honor.

7           MR. WALLENSTEIN:  And it's 30 in Severiano's,

8   but it's the same verbiage.

9           MS. MERKL:  Yes.

10          THE COURT:  Okay.

11          MS. MERKL:  Similar to Jane Doe 7, Odilon

12  brought her to the United States under false pretenses,

13  and required her to start work shortly thereafter, and

14  again in the circumstances where she had absolutely no

15  way of escape.  She was in the United States illegally.

16  He knew it.  She knew it, and had no means of access to

17  law enforcement, family members, any financial means of

18  support.

19          MR. ROSENBERG:  We make the same arguments that

20  we did for number 4, your Honor.  And she arrived in the

21  United States based on promises that he made to her to

22  induce her to come here, false promises, and I think it's

23  all subsumed.

24          MS. MERKL:  And I would just like to briefly

25  read excerpts of the affidavit's extradition prepared by

29

Proceedings

1   Jane Doe 9.  After she was brought to the United States

2   illegally, they spoke on the phone, and then this is

3   where I am going to start to read -- this is from

4   paragraph 5 of the English-language translation of the

5   extradition affidavit made under oath by Jane Doe 9.

6           "When I called him, he told me I was going to

7   work as a prostitute.  When I told him no, he told me

8   that I had to because I was in the United States

9   illegally, and would not be able to find any other kind

10  of work.  I was confused, and did not know what to do.  I

11  was by my -- it was my first time in the United States.

12  I did not speak English, and I had no friends of family

13  nearby.  After this conversation, I refused to speak to

14  him for a week.  When I finally talked to him, he told me

15  again that I had to work as a prostitute, and that I had

16  to send all of the money that I made from working as a

17  prostitute to him in Mexico."

18          She then goes onto explain how a female co-

19  conspirator/victim frankly, taught her how to work.

20          MR. ROSENBERG:  And being an illegal alien

21  would certainly cover millions of people of this country,

22  your Honor, and that would not make each and every one of

23  them a vulnerable victim.  What is particularly --

24  particular about this victim number 9, other than the

25  fact that she was here illegally, and didn't have a job?

30

Proceedings

1    I mean, that's a description of literally millions of

2    people in this country.

3           MS. MERKL:  But those individuals, your Honor,

4    often have made the choice in their own free will to come

5    to the United States to seek employment of their

6    choosing, as opposed to being under the control of

7    members of a sex trafficking organization, who are

8    telling her that she has no choice, and the implicit

9    threat there is that she will have no where to live, and

10   no way to eat if she does not comply, after being lured

11   here by them, as opposed to making an affirmative choice

12   of her own.

13          THE COURT:  Well, find the vulnerable victim

14   enhancement here as well.  So then we have to go back

15   to --

16          MR. ROSENBERG:  Number 1.

17          THE COURT:  Number 1.

18          MS. MERKL:  Your Honor, as to Jane Doe 1, this

19   is the one who was in the dire economic circumstance with

20   three children who needed medical care.

21          THE COURT:  I know.  I know.  I just want to

22   read the case that's been cited but I don't have my

23   reading glasses.

24   (Pause)

25          THE COURT:  Ms. Merkl, did you want to see the

31

Proceedings

1    case that he's relying on?

2            MS. MERKL:  This is Sabatino, your Honor?  I'm

3    reading it on my phone.

4            THE COURT:  Oh, okay.

5            MS. MERKL:  It's very tiny.

6            THE COURT:  I know, that's why I --

7            MR. ROSENBERG:  Get a bigger phone.

8    (Pause)

9            THE COURT:  Okay.

10           MS. MERKL:  Your Honor, having taken a moment

11   to refresh on the Sabatino case, the government's

12   position remains that this case is simply not on all

13   fours with the victims here.  The Sabatino situation seem

14   to be preying upon young women and -- who were American,

15   and were in a place where they lived presumably, and the

16   vulnerabilities that were relied upon were the age -- a

17   couple of the prostitutes were 18, a couple of them had

18   small children, and some of them were out of work.  And

19   the Court in Sabatino decided that that was insufficient

20   in its totality to render them unusually vulnerability

21   from a different -- types of women and girls who find

22   themselves in a prostitution situation.

23           So your Honor, we have all of those factors, in

24   addition to more factors; the, you know, victims'

25   isolation.

32

Proceedings

1          THE COURT:  Well, all of those factors that

2     were found inadequate.

3          MS. MERKL:  Right.  We have more.

4          THE COURT:  Yes, okay.

5          MS. MERKL:  That's what I am saying.  We have

6     victims who were brought to a foreign country under false

7     pretenses, and then held in this situation where they had

8     no option but to do the work, and nowhere to turn.  They

9     knew they were here illegally.  They reminded by the

10    traffickers that they were here illegally, and couldn't

11    get any other type of employment as a consequence, who

12    had no opportunity to earn money in any other way under

13    the circumstances presented to them, and that is in stark

14    contrast from the women in <u>Sabatino</u> who appeared to be

15    domestic victims.

16          MR. ROSENBERG:  Respectfully, I don't think

17    that the locale or the -- where these ladies came from is

18    a tipping point in the government's favor, your Honor.

19    These women may have been told certain things that were

20    or were not true, as far as their ability to get other

21    work, but again, I may liken them to illegal aliens who

22    were here in have trouble finding work because they're

23    illegal, and I don't think that that should be tipping

24    point that pushes the <u>Sabatino</u> characteristics over to

25    the government's side.

33

Proceedings

1          MS. MERKL:  Your Honor, at risk of repeating

2   myself, they did not come here of their own volition,

3   under correct pretenses.  That's not -- they didn't come

4   here to be prostitutes.  They came here for a better

5   life.

6          THE COURT:  No, I understand that but that's

7   not what makes them vulnerable.

8          MS. MERKL:  No, that's what distinguishes them

9   from being just a regular, illegal alien, that's all.

10          THE COURT:  I'm going to keep the vulnerable

11   for this one, as well.  I agree that it's distinguishable

12   from Sabatino because of the fact that they were not --

13   not because of the fact that they --

14          MR. ROSENBERG:  I'm sorry, your Honor, you're

15   finding vulnerability as to 1 --

16          THE COURT:  Yes, because of the reasons given

17   by Ms. Merkl.  It goes beyond -- they were here under

18   circumstances which made them particularly vulnerable.

19          MR. ROSENBERG:  Well, those are the three --

20          THE COURT:  Yeah.

21          MR. WALLENSTEIN:  And, Judge, with respect to

22   those, I think that Severiano's in a different position

23   that --

24          THE COURT:  Which one are you --

25          MR. WALLENSTEIN:  As to --

34

Proceedings

1          THE COURT:  Are we talking about the same ones?

2          MR. WALLENSTEIN:  Yes, as to 1, 4, and 9,

3    Severiano's in a different position than Odilon because

4    Odilon was the one who did the enticing, if you will, and

5    the one who brought the victims here.  Severiano comes

6    into the picture much later on, when they are brought to

7    him in Alabama, at least as far as number 9 and number 1

8    are concerned, I believe that's correct.  So --

9          THE COURT:  Is his worded the same way as to

10   Jane Doe number 1, his presence report?

11         MR. WALLENSTEIN:   The presence report is

12   identical --

13         THE COURT:  Okay.

14         MR. WALLENSTEIN:  -- with respect to the

15   wording, but his conduct is different than his brother's,

16   and I think it's difficult, if not impossible to

17   establish that he was aware of their status of, or their

18   vulnerability prior to him encountering them, which is

19   later on down the road.

20         MS. MERKL:  Your Honor, given the close

21   collaboration and partnership of these men, including the

22   evidence suggesting that they had regular conversations

23   about which victims earn more money, and which victims

24   were worthwhile, the government's position is that

25   reasonable inferences can be drawn to conclude that

Proceedings

1   Severiano, of course, knew that Jane Doe 1 was, you know,

2   vulnerable, for example, when she was deposited to him in

3   his trailer, and expected to work in isolated conditions

4   in the middle of nowhere in Alabama.

5           Similarly, your Honor, as to Jane Doe 4, the

6   defendant clear --

7           THE COURT:  So his actions with respect to Jane

8   Doe 1 were driving her to the border?

9           MS. MERKL:  Your Honor, with respect to --

10          THE COURT:  Driving her and others to the

11  airport in Mexico City, where he gave airport tickets.

12  I'm looking at the bottom of page 8 of Odilon.

13          MS. MERKL:  As to Jane Doe 1, your Honor,

14  Severiano both facilitated with her transportation across

15  the border before she was victimized here in the United

16  States, and forced to begin work, and then later on,

17  after Mr. Severiano was in the United States and running

18  a brothel trailer, he was -- Jane Doe 1 was brought to

19  him to work in his trailer.  This is all in same

20  paragraph, your Honor.

21          And he also sexually assaulted her while she

22  was working in his trailer.

23          THE COURT:  Who is "he"?

24          MS. MERKL:  Severiano.  So he saw her before

25  and during her work in commercial sex.

36

Proceedings

1      THE COURT:  I don't see how that's different.

2  Maybe if we just stopped at the first part, that he just

3  drove her to the airport and gave her tickets, but he was

4  there.  He provided, according to -- I'm just reading

5  this out of context -- during that time -- now I am

6  getting confused by the names -- during that time,

7  Severiano Martinez-Rojas raped Jane Doe 1 on two

8  occasions, and he prostituted her, Martinez-Rojas, at a

9  trailer that he operated as a brothel in Alabama.

10      MR. WALLENSTEIN:  That's what it says.

11      THE COURT:  Yeah, but then I don't see how it's

12  any different.

13      MS. MERKL:  Your Honor, and as to the

14  inducement to leave, and the arrangements to leave, there

15  is additional information contained within Jane Doe's

16  extradition affidavit should the Court care to read it.

17      THE COURT:  Yes.

18      MS. MERKL:  Your Honor, I will hand that up.

19      THE COURT:  Why don't you just read it into the

20  record, unless it's long, otherwise, I'll read it.

21      MS. MERKL:  Specifically, your Honor, Jane Doe

22  1 explained that Odilon and his brother, Severiano

23  Martinez-Rojas, would come to the restaurant -- come to

24  her place of employment during the recruitment process

25  but then moving onto paragraph 5 in the extradition

37

Proceedings

1   affidavit, she explained, "Odilon took me to the town of

2   Tenansingo (ph.), where he and his family lived.  After

3   several days, he left for the United States.  Before he

4   left, he told me that Severiano would take care of me.  I

5   asked Severiano if he could take me to his wife's

6   employment, so that I could work and earn money.  He told

7   me that I needed to rest because I was going to work and

8   earn a lot of money in the United States."

9               THE COURT:  Okay.

10              MS. MERKL:  She then describes how he took her

11  to the border.  And I submit, your Honor, that Severiano

12  knew exactly what was in store for Jane Doe when she was

13  arriving -- Jane Doe 1, when she was coming to the United

14  States because of his prior involvement with his family

15  business.

16              THE COURT:  Well, he was also involved in it

17  when she was in the United States.

18              MS. MERKL:  Exactly.

19              THE COURT:  Okay.  What's the next --

20              MR. WALLENSTEIN:  Number 3, I believe.  I'm

21  sorry, number 3 does not have the vulnerable victim

22  enhancement.

23              Number 6, which you applied to --

24              MS. MERKL:  Your Honor, just to be clear, Jane

25  Doe 3 does have a vulnerable victim enhancement in the

38

Proceedings

1   PSR but this is one of the Jane Doe victims, as to whom

2   the government is not taking the position that she was

3   uniquely vulnerable.

4           So if the PSR needs to be amended, we need to

5   do that.  That's in paragraph 80 of Severiano's PSR.

6           MR. WALLENSTEIN:  I agree the PSR needs to be

7   amended if it shouldn't apply.

8           THE COURT:  Okay.  Does that change your

9   guidelines calculation?

10          MR. GJELAJ:  We have one error that we need to

11  acknowledge that is going to change the guidelines

12  calculation with (indiscernible) --

13          THE COURT:  I'm just suing -- let me just get

14  the --

15          MR. GJELAJ:  Not with respect to Severiano, but

16  Odilon.

17          THE COURT:  Well, let's not jump around.

18          MR. GJELAJ:  Okay.

19          THE COURT:  I'm just asking whether this --

20          MR. GJELAJ:  Whether this, taking away the

21  vulnerable victim with respect to which Jane Doe?

22          THE COURT:  Yeah, reflect --

23          MS. MERKL:  Number 3.

24          THE COURT:  Does that reflect -- does that

25  alter your guidelines calculation?

39

Proceedings

1          MS. MERKL:  I don't think it actually would

2     affect the grouping, your Honor, but we'd have to get

3     there to know.

4          MR. ROSENBERG:  It does for Odilon though, but

5     we'll get back to him.

6     (Pause)

7          MR. GJELAJ:  No, your Honor, that in of itself

8     does not change the guidelines.

9          THE COURT:  So --

10         MR. GJELAJ:  It does not change the guidelines.

11         THE COURT:  So Severiano's remains the same.

12         MR. GJELAJ:  Severiano's remains the same.

13         THE COURT:  Okay.  And that's 235 to 293?  I'm

14    sorry.

15         MR. GJELAJ:  Yes.

16         THE COURT:  Okay.  Now you said there's one in

17    Odilon's that has to be changed?

18         MR. GJELAJ:  Yeah.

19         THE COURT:  Go ahead.

20         MR. GJELAJ:  Paragraph 78 -- I'm sorry, 79.

21    Consistent with your Honor's ruling yesterday, and

22    consistent with all of the other PSRs, the count of

23    conviction here is nto a 1591.  So this would go over to

24    guidelines 2A3.1.

25         THE COURT:  What paragraph are you on now?

40

Proceedings

1      MR. GJELAJ:  79.

2      THE COURT:  Yeah.

3      MR. WALLENSTEIN:  I have it as paragraph 80 for

4  the vulnerable victim enhancement.

5      MS. MERKL:  We're (indiscernible) about

6  Severiano.

7      MR. WALLENSTEIN:  I'm sorry.

8      MR. GJELAJ:  No, we're not -- yeah.  I will get

9  to that in a moment.  And so the cross reference will

10  take you to 2A3.1, which it has in the other counts, and

11  that will be a base offense level of 30.

12      And the only other associate that applies is

13  the plus 4, since it's conduct in 2241, and that's a plus

14  4.

15      THE COURT:  Where is a plus 4?

16      MR. GJELAJ:  Plus 4 should be at paragraph 80.

17      THE COURT:  So it's going --

18      MR. GJELAJ:  If you go -- if --

19      THE COURT:  -- from a plus 2 to a plus 4?

20      MR. GJELAJ:  So it's a 30 base offense level,

21  and then plus 4 at 2A3.1(b)(1).

22      THE COURT:  And so that raises the adjusted

23  offense level?

24      MR. GJELAJ:  No, that actually lowers it.

25      THE COURT:  I don't know.  I am lost.

41

Proceedings

1          MR. GJELAJ:  So the adjusted offense level for

2   that count, Judge, for Jane Doe 5, is a level -- well, in

3   the addendum it turns -- it's amended to be a level 40.

4   It's now a level 34.

5          THE COURT:  So paragraph -- according to you,

6   paragraph 85 is 34?

7          MR. GJELAJ:  Paragraph 85 should be a 34.

8          MS. MERKL:  Correct.

9          THE COURT:  Okay, I see that.  And how does

10  that affect the overall guidelines?

11         MR. GJELAJ:  Yes, thank you, your Honor.  So

12  rather than the 40 -- if you received the addendum, your

13  Honor, it's easier to work off of that, because there was

14  a mathematical error in the presentence report that was

15  corrected in the addendum.

16         THE COURT:  I don't see -- let me just get the

17  addendum.  Do you all have the addendum?

18         MR. WALLENSTEIN:  I have that.

19  (Pause)

20         THE COURT:  Why don't you go ahead and explain

21  it to everybody?

22         MR. GJELAJ:  I have a copy, Judge.

23         THE CLERK:  Paula, he's written this all out.

24         MR. GJELAJ:  So let me explain where the

25  probation department is right now.

                                                                    42
                           Proceedings

1    (Pause)

2                MR. GJELAJ:  Now again this --

3    (Pause)

4                MS. MERKL:  Your Honor, there is one additional

5    issue with regard to the --

6                THE COURT:  Let's --

7                MS. MERKL:  -- base offense level for Jane Doe

8    1, that will affect the overall calculation.  Okay.

9                THE COURT:  Okay.

10               MS. MERKL:  So I just -- I don't want to do

11   things out of order but at the same time, I'm not sure

12   it's worthwhile to do all of the grouping analysis until

13   we have figured out the individual predicate acts.

14               THE COURT:  Okay.

15               MS. MERKL:  So as to Jane Doe 1, your Honor, we

16   have addressed the vulnerable victim issue, but as set

17   forth in the government's sentencing submission at page

18   48, and as included in our plea agreement estimate as to

19   both defendants, we believe that the serious bodily

20   injury enhancement should apply for Jane Doe 1.

21               Jane Doe 1's physical circumstances were above

22   and beyond some of the physical abuse that the other

23   victim suffered, in no way suggesting that those are not

24   significant injuries, but as to the serious bodily injury

25   of lasting damage to her person, Mr. Martinez-Rojas

43

Proceedings

1  required her to get a large tattoo against her will, and

2  tattooing is itself very painful, and a permanent scar to

3  the body.

4          THE COURT:  I'm sorry, where is this in the

5  presentence report?

6          MS. MERKL:  I'm not sure it's in the

7  presentence report, your Honor.

8          MR. WALLENSTEIN:  It's not in your memo either.

9          MS. MERKL:  It is in our memo.  It's on page 48

10  of our memo.  He required her to get a large tattoo, your

11  Honor, and that --

12          THE COURT:  A large what?

13          MS. MERKL:  Tattoo of --

14          THE COURT:  Tattoo.

15          MS. MERKL:  -- a saint that he admires.  It's

16  like an image of Santa Muerta, which is, you know, death

17  wearing like a wedding dress.  Apparently this particular

18  defendant had a fascination with that particular saint,

19  and required that -- Jane Doe 1 to get a large tattoo of

20  it on her body.  That itself was painful.  Getting it

21  removed after it was photographed by agents, after she

22  was recovered from her trafficking situation, was

23  likewise very painful.

24          And that bodily injury, your Honor, we submit

25  you know supports that two-level upward adjustment.  So

44

Proceedings

1  it's our position that the applicable guidelines for Jane

2  Doe 1 is 38, not 36, which is I believe where the

3  probation department was starting our analysis.  That's

4  the reason for the interruption.

5              THE COURT:  So getting a tattoo is a serious

6  physical injury.

7              MS. MERKL:  Against your will, your Honor.

8  It's a scar.

9              THE COURT:  Is that -- against --

10             MS. MERKL:  It's a permanent scar, and it's

11 extremely painful.

12             THE COURT:  I know, but there are many people

13 who would have tattoos all over their body.

14             MS. MERKL:  And they could probably all tell

15 you it's painful.

16             THE CLERK:  I will tell you it's painful.

17             MS. MERKL:  And your Honor, when it's against

18 your will, it's a form of punishment that permanently

19 disfigures your body, and that fits well within the

20 definition of serious bodily injury as to the guidelines.

21             THE COURT:  Where was the tattoo?

22             MS. MERKL:  On her -- where was it on her body?

23 I would have to double-check the reports, your Honor.  I

24 have them in the courtroom if that's important.

25             THE COURT:  I'm just curious, where was it?

45

                              Proceedings

1            MS. MERKL:  I'm not certain where on the body

2    it was.  By the time I had met Jane Doe 1, your Honor,

3    she had had the tattoo removed.  The agents in Oklahoma

4    or Texas had photographed the tattoo prior to my meeting

5    her, but I personally have not seen the photographs.

6            MR. WALLENSTEIN:  Are you suggesting that

7    applies to Severiano, as well, that enhancement?

8            MS. MERKL:  She suffered it during her -- it's

9    during the offense, it's not as to the defendant, is the

10   government's position.

11           THE COURT:  What page in your memo?

12           MS. MERKL:  Page 48, your Honor.

13           THE COURT:  Where is the serious bodily injury

14   defined in the guidelines?

15           MS. MERKL:  1B1.1, your Honor.

16           THE COURT:  Okay.

17   (Pause)

18           THE CLERK:  Go ahead.

19           MS. MERKL:  Page 26 of the PSR is the

20   adjustments applicable to Jane Doe 1 in Odilon Martinez-

21   Rojas' PSR, your Honor, and it is the government's

22   position that 2 points should be added for serious bodily

23   injury bringing that total adjusted offense level for

24   Racketeering Act 3(a) to a 38.

25           THE COURT:  Look, I'm -- it may indeed involve

46

Proceedings

1  physical pain, but I have no basis for taking judicial

2  notice of the fact that it involves extreme physical

3  pain.

4          MS. MERKL:  Your Honor, it's permanent

5  disfigurement.  She's permanently disfigured against her

6  will by having a needle shoved into her body hundreds of

7  times.  That's what a tattoo is, with all respect.

8          THE COURT:  Well, tell me where it fits in the

9  definition.

10          MS. MERKL:  Your Honor, I believe that it fits

11  under application note 1M, where she had an injury

12  involving extreme pain that later required surgery to

13  have it removed.  She needed to have laser surgery, I

14  believe more than once to get the tattoo ink out of her

15  skin.

16          I've had victims in cases similar, your Honor,

17  who have had surgery multiple times to remove all of the

18  ink.

19  (Pause)

20          THE COURT:  Well, it reads -- I don't -- it

21  seems to me that what requires the intervention of

22  surgery, hospitalization, or physical rehabilitation, is

23  the impairment of a function of a bodily member organ or

24  mental faculty.

25          MS. MERKL:  Your Honor, it says "or" after the

47

Proceedings

1  semicolon.  Serious bodily injury means one of those

2  things, or an injury requiring medical intervention such

3  as surgery, hospitalization, and physical rehabilitation.

4        I believe that the means injury applies to

5  involving, and then the requiring after all -- the or

6  following the semicolon.  The --

7        MR. ROSENBERG:  It was required.  It was at

8  that point, it was an optional surgery.

9        MS. MERKL:  She could bear the permanent mark

10  of being trafficked for her lifetime, or she could get

11  the medical intervention necessary to cure the injury,

12  your Honor.  She chose the latter.

13        MR. ROSENBERG:  It was certainly not a life

14  threatening injury, Judge, nor one that was --

15        THE COURT:  It doesn't require life

16  threatening.

17        MR. ROSENBERG:  -- that interfered with a

18  bodily function.

19        MS. MERKL:  That's why we're not seeking four

20  points, your Honor.  We're seeking two.  I'm not saying

21  it was permanent or life threatening, we're saying it was

22  serious.  And anybody who has had a tattoo or seen

23  somebody get a tattoo can tell you it is essentially the

24  imposition of a giant scab on the body by repeatedly

25  hitting yourself with a needle, and that to remove such

48

Proceedings

1  tattoo requires laser surgery, which is also expensive.

2           THE COURT:  I don't know about the whole

3  business about tattoos except that you see people with

4  tattoos, particularly athletes where you can see their

5  arms, full of tattoos, and I mean there's no way to --

6  and they're all putting themselves through this extreme

7  physical pain?

8           MS. MERKL:  Yes.  Yes, your Honor.  It's very

9  painful.

10          THE COURT:  What about the next sentence, with

11 in addition, serious bodily injury is deemed to have

12 occurred.

13          MS. MERKL:  Your Honor, that --

14          MR. GJELAJ:  That's precluded, your Honor,

15 since --

16          MS. MERKL:  That's precluded by the cross -- by

17 the actual underlying guidelines about sex trafficking,

18 commercial sexual abuse.  I think Mr. Gjelaj was saying

19 the same thing.  I'm sorry, I cut you off.

20          MR. GJELAJ:  No, that's quite all right.

21 (Pause)

22          THE COURT:  So if I set aside the extreme

23 physical pain, you would say this is an injury, and I

24 read it now as I see you would read it, that this was an

25 injury requiring medical intervention, such as surgery,

49

Proceedings

1    hospitalization, or physical rehabilitation.

2               MS. MERKL:  Yes, your Honor.  We think that

3    both of those prongs apply.

4               MR. WALLENSTEIN:  Again, it didn't require it,

5    it was optional.

6               MS. MERKL:  Or she could be branded for life

7    with a tattoo she didn't want to remind her of her

8    trafficker.

9               THE COURT:  And did she give an affidavit or a

10   statement about extreme physical pain?

11              MS. MERKL:  Your Honor, I do not believe that

12   the discussion of the tattoo was included in her

13   extradition affidavit as it was not relevant to the

14   elements of the offense that we set forth in the Mexican

15   government.  So I just checked her extradition affidavit.

16   She does not discuss it there but she did describe it at

17   length in her debriefings, and was originally -- the

18   tattoo was photographed before it was removed.

19              THE COURT:  Do you have the photograph?

20              MS. MERKL:  I don't have the photograph with

21   me.

22              THE COURT:  And what affect does this have on

23   the guidelines?

24              MS. LEE:  I'm sorry?

25              THE COURT:  What affect does this have on the

50

Proceedings

1   guidelines.

2           MR. GJELAJ:  It would be the highest adjusted

3   offense level, your Honor.  So this would be the offense

4   level we would work off of.  It's a level --

5           THE COURT:  No, I know, but what is the -- in

6   actual numbers?

7           MR. GJELAJ:  It would be two levels, and we

8   would be looking at an ultimate guidelines level of -- so

9   with this enhancement, your Honor, it would be a level

10  38.  That's the total offense level, 38, with a

11  guidelines range of 230- --

12          MS. MERKL:  No.

13  (Pause)

14          MR. GJELAJ:  With the enhancement, it would be

15  a total offense level of 38, 235 to 293.  Without this

16  enhancement, it would be a level 36, at 188 to 235.

17          THE COURT:  So tell me again what it is.

18          MR. GJELAJ:  With the enhancement it's a level

19  38, 235 to 293.  Without this enhancement, it would be

20  188 -- sorry, level 36, 188 to 235.

21  (Pause)

22          THE COURT:  And how does this interact with

23  subdivision (K), which talks about an obvious

24  disfigurement that is likely to be permanent?

25          MS. MERKL:  Your Honor, under the 2A3.1

Transcriptions Plus II, Inc.

51

Proceedings

1   guidelines, the permanent bodily injury enhancement is a

2   four-level enhancement, where a serious bodily injury is

3   a two-level enhancement.  The degree of injury between

4   those two things is a three-level enhancement.

5         Although we do note that the obvious

6   disfigurement likely to be permanent does accurately

7   describe an unwelcome tattoo.  There is a strong item for

8   the four, but we estimated two in the plea agreement for

9   a total estimate of 38, on this predicate as to this

10   victim, and so you know, we're not going to argue for

11   more than we estimated in the plea agreement.

12   (Pause)

13         MS. MERKL:  Your Honor, if it's of interest,

14   the agents in the back were able to obtain a picture of

15   the tattoo.  It appears to be on the one shoulder.  It's

16   multi-colored.  It seems to be of a decent size.  If her

17   shoulder is average size, I would say it's at least four

18   to five, if not six inches tall.

19   (Pause)

20         THE COURT:  I will do it under extreme physical

21   pain on the condition that you provide me, before I enter

22   the judgment with evidence of that because I'm not

23   prepared to take judicial notice of it, and it all

24   depends on what pain she suffered.  People tolerate pain

25   differently.

52

Proceedings

1          MS. MERKL:  I understand, your Honor.

2          THE COURT:  I think it's a -- you know, whether

3    it required medical intervention, it's a very close

4    question.

5          MS. MERKL:  Your Honor, I can just tell you

6    that there are dermatologists here in the City who

7    provide pro bono tattoo removal for victims of human

8    trafficking.  That's a service that various

9    dermatologists provide.  And it is normally laser

10   surgery, and unfortunately, it's more common than you

11   might expect, that victims are essentially branded by

12   their traffickers --

13         THE COURT:  No, no, I don't --

14         MS. MERKL:  -- and that requires surgery to

15   remove that scar.

16         THE COURT:  To remove the tattoo but not

17   necessarily to alleviate an injury.  Look these -- I'm

18   sure that people have tattoos removed in circumstances

19   even where they had them voluntarily --

20         MS. MERKL:  Certainly.

21         THE COURT:  But I feel more comfortable with --

22   if, in fact, you provide me with evidence of extreme

23   physical pain.

24         MS. MERKL:  We'll be in contact with the

25   victim, your Honor, and see what we can do.

53

Proceedings

1        THE COURT:  But for the moment, I am going to

2   leave it as serious physical injury.

3        MS. MERKL:  Thank you, your Honor.

4        MR. ROSENBERG:  So does that leave us with

5   Odilon's advisory guidelines range of 235 then, to 293,

6   both in the --

7        THE COURT:  292 or 293?

8        MR. ROSENBERG:  -- plea agreement, and -- 293 -

9   -

10       THE COURT:  293.

11       MR. ROSENBERG:  -- both with --

12       MR. GJELAJ:  293, your Honor.

13       MR. ROSENBERG:  -- the agreement and with the

14   PSR?

15       THE COURT:  Yes.

16       MS. MERKL:  And your Honor, I would just note

17   that for Severiano, the government had not included the

18   serious bodily injury as to Jane Doe 1 since he was not

19   personally involved.

20       THE COURT:  Okay.  So what is -- I'm -- what is

21   -- where are we?  The guidelines range with respect to

22   Severiano is what now?

23       MR. WALLENSTEIN:  I still have one -- I mean, I

24   objected to all of the vulnerable victim enhancements for

25   all of the victims.  I understand your Honor's position.

54

Proceedings

1   My position with respect to each of them is what I've

2   already articulated.

3          THE COURT:  Right.

4          MR. WALLENSTEIN:  And I believe the

5   government's position is the same as well.

6          THE COURT:  Right.

7          MR. WALLENSTEIN:  So I think you just have to

8   rule on those objections.

9          THE COURT:  I did.  I rejected them.

10          MR. WALLENSTEIN:  Okay.

11          THE COURT:  I thought I did anyway.

12          MR. WALLENSTEIN:  I said okay but I didn't

13   really mean that.  I do have one other objection that I

14   raised in my sentencing memorandum, and that is to the

15   aggravating role, and that is -- as soon as I find it --

16          MS. MERKL:  That's to FBF, your Honor, Count

17   1 --

18          MR. WALLENSTEIN:  Yes.

19          MS. MERKL:  -- of the Northern District of

20   Georgia indictment.

21          THE COURT:  Just one second.

22          MR. WALLENSTEIN:  Correct.  The PSR ascribes no

23   aggravating or mitigating role to Severiano for any of

24   the counts, and the government says there should be an

25   aggravating role but they don't say why.  They don't

55

Proceedings

1   support that.  Where is this?  It's respect to 1?

2              MR. WALLENSTEIN:  It is -- it's actually --

3   it's in the plea agreement.  It's not in the PSR.  And it

4   is on page 6 of the plea agreement under Count 1 of the

5   Northern District of Georgia indictment for the sex

6   trafficking of FBF.

7              THE COURT:  No, it's not in the PSR?

8              MR. WALLENSTEIN:  I'm sorry?

9              THE COURT:  It's not in the PSR?

10             MR. WALLENSTEIN:  It'S not in the PSR.

11             THE COURT:  So the --

12             MR. GJELAJ:  Sometimes we do things

13   independently, Judge.  We did not apply a role

14   enhancement.

15             MS. MERKL:  Your Honor, as set forth in the

16   government's sentencing submission, the rationale for

17   doing so states upon the ruling of Judge Amy Totenberg in

18   Odilon Martinez-Rojas' sentencing, as to this same

19   conduct, Judge --

20             THE COURT:  Where is this conduct described?

21             MS. MERKL:  So page 54 of the government's

22   sentencing submission is discussing the sex trafficking

23   of FBF, and the conduct relating to FBF is set forth in

24   the PSR in paragraph 37.

25             And the judge in Georgia made that the

56

Proceedings

1  determination as to Odilon --

2         THE COURT:  It's in 37 of Severiano --

3         MS. MERKL:  Paragraph 37, Severiano's PSR.  And

4  the way that the PSR describes Severiano's relationship

5  with FBF's sort of recruiter, is one of managerial

6  control, and that is what Judge Amy Totenberg found.  She

7  found that Arturo Rojas Ayoto (ph.), who was the

8  individual who recruited FBF in the Georgia case, had a

9  sort of, you know -- that the two older men, Odilon and

10 Severiano --

11        THE COURT:  On what page -- paragraph 37, we're

12 dealing with additional victim, FBF?

13        MS. MERKL:  Yes.

14        THE COURT:  Let me just read it.

15 (Pause)

16        THE COURT:  Is there any particular paragraph

17 you wanted me to look at?

18        MS. MERKL:  Your Honor, I believe that

19 paragraphs 39 and 40 are particularly supportive of the

20 government's position that Severiano Martinez-Rojas was

21 essentially training his younger nephew on how to be a

22 trafficker, in directing the trafficking of FBF including

23 instructing his nephew to cut her face when she did not

24 comply with Arturo's demands, similar to Odilon telling

25 Rojas-Quijotal (ph.) to beat FBF.

Proceedings

1          THE COURT:  Let me read it.

2          MR. WALLENSTEIN:  Judge, as I read --

3          THE COURT:  Let me read --

4          MR. WALLENSTEIN:  I'm sorry, your Honor.

5          THE COURT:  I can't listen and read.

6  (Pause)

7          THE COURT:  Okay.  I am ready to hear you.

8          MR. WALLENSTEIN:  Judge, as I read paragraphs

9  39 and 40 --

10          THE COURT:  I interrupted Ms. Merkl.

11          MS. MERKL:  Yes, your Honor.  As to those

12  paragraphs 39 and 40, it's the government's position that

13  is guiding this younger criminal associate in sort of

14  essentially how to traffic her, is managerial control and

15  leadership in that criminal conduct.

16          Judge Amy Totenberg found that enhancement on

17  the same theory as to Odilon Martinez-Rojas and the

18  government's position is that Severiano Martinez-Rojas,

19  who was equally involved in the direction of the

20  trafficking of that young girl be held similarly

21  responsible for that enhancement, which was already

22  applied to his brother.

23          MR. WALLENSTEIN:  Well, I don't agree with

24  that.  I think the way these paragraphs read, they

25  describe the offense and Severiano's conduct, as part of

Proceedings

1   the offense, and certainly he's pleaded guilty to

2   participating in the offense.  I don't think that this

3   rises to the level of any kind of managerial control.

4   Merely telling someone do a particular act is not

5   sufficient.  They have to be in a position of management

6   and control, and essentially to direct pretty much

7   everything that the underling does, and there's no

8   evidence to that effect here.

9           And with all due respect to Judge Totenberg, I

10  wasn't there, I haven't read the record, and maybe she

11  found it as to Odilon, but that doesn't mean it applies

12  to Severiano, and in this case for once, I agree with

13  probation.  They did not apply an aggravating role, and I

14  think they were a 100 percent right.  I sometimes agree.

15          MS. MERKL:  Your Honor, nothing in the

16  guidelines state that he has to be in charge of the whole

17  thing.  He's supervising his younger nephew, and giving

18  direction.  He's also directing a female associate to

19  teach the girl how to work in prostitution.  He's telling

20  his nephew to cut her when she defied him.

21          THE COURT:  Where was the teaching of people

22  that you just described?

23          MS. MERKL:  Let me find it, your Honor.  Your

24  Honor, paragraph 39 describes how she was groomed by

25  another female in the residence.  It does not describe

59

Proceedings

1   the facts as I understood them, and that's described in

2   the government's sentencing submission, that Severiano

3   directed her to do so, and we could certainly find the

4   report on which that is based.

5           THE COURT:  Where is that, what paragraph?

6           MS. MERKL:  Paragraph 39.  "When FBF arrived,

7   her recruiter, Rojas-Quijotal, had been captured at the

8   border."  So when she arrived to their home in Georgia,

9   Odilon and Severiano took her and she was then groomed by

10  another female in the residence to work.  That female was

11  under the control of those two men in the home.

12          THE COURT:  And does this affect the guidelines

13  calculation?

14          MS. MERKL:  I don't know if it affects the

15  overall calculation, your Honor, because he has various

16  guidelines that come out at a level 38.  I think it does

17  not affect the overall guidelines calculation.

18          THE COURT:  Why do I have to deal with this?

19          MS. MERKL:  Your Honor, it' a simply a matter

20  of --

21          THE COURT:  I could consider the conduct in the

22  sentence that I impose, but I don't know why I have to

23  deal with it as to whether it requires a --

24          THE CLERK:  Judge, the microphone.

25          THE COURT:  -- it requires a role enhancement,

Proceedings

1   contrary to what probation thinks.

2          MS. MERKL:  Your Honor, ultimately, I do think

3   it comes out in the wash.

4          THE COURT:  So what --

5          MS. MERKL:  So it's up to you.

6          THE COURT:  So let's --

7          MR. WALLENSTEIN:  I unfortunately agree with

8   that.

9          THE COURT:  So I will leave the probation

10  report the way it is.  The conduct is a different story

11  in terms of the application in determining what sentence

12  should be imposed.

13         MR. WALLENSTEIN:  Judge, I think that I have no

14  other objections to the PSR finally, and so --

15  (Counsel confer)

16         MR. ROSENBERG:  The alien smuggling doesn't

17  matter.

18         MR. WALLENSTEIN:  It doesn't matter.

19         MS. MERKL:  Your Honor --

20         MR. ROSENBERG:  It doesn't (indiscernible).

21         THE COURT:  So the guidelines remain --

22         THE CLERK:  I believe for both defendants,

23  Judge, level 38 to 35 (indiscernible).

24         MS. MERKL:  Yes, for the global plea, that's

25  correct.

61

                    Proceedings

1           THE COURT:  All right.  Why don't you sit down?

2           THE CLERK:  Hmm?

3           THE COURT:  Why doesn't he sit down.  I want to

4   sentence each one of them separately.

5           THE CLERK:  Okay.

6   (Pause)

7           THE CLERK:  Judge, Severiano has taken a seat.

8   Odilon is still before the Court.

9           THE COURT:  Okay.

10          MR. ROSENBERG:  Thank you, your Honor.  Well,

11  one of the other provisions of the plea agreement was

12  that the government was not going to advocate for a

13  consecutive sentence to a sentence that Odilon is now

14  serving, the 262 months sentence that he received in the

15  Northern District of Georgia, and frankly that's a major

16  concern of ours, your Honor, a major application that we

17  have.

18          THE COURT:  I'm not going to -- I'm going to

19  run them -- I'm not going to run it consecutively.  I'm

20  going to run it concurrently.

21          MR. ROSENBERG:  And I just want to make one

22  comment.  Our calculation in my sentencing submission

23  came to a level 36, based on the elimination of

24  vulnerable victims that would've made it a 188 to 235

25  range.  And I had asked for 188, and the government said

62

Proceedings

1   well, you know, to was kind of nervy because this conduct

2   was as great as.

3           Let me make clear, I wasn't asking for a 188

4   because I was looking for leniency or to reflect less

5   serious conduct.  The only reason that I asked for a

6   lower sentence was that my concern that the Bureau of

7   Prisons would not properly or give him credit if he were

8   to receive a sentence between 235 and 293, for the time

9   -- the five years he's already served in Georgia, as

10  1(b)(1) relevant conduct here, and my concern was that

11  the Bureau of Prisons would not give credit for the first

12  already five years that he's served -- that he's been

13  serving to your Honor's sentence.

14          So I was concerned that he would end up with a

15  longer sentence than your Honor would be imposing,

16  because it would be tacked onto what he's already

17  received, 262 months.  So that's the only reason why I

18  asked for a below guidelines range.  I'm not saying

19  that --

20          THE COURT:  Well, is that true?

21          MR. ROSENBERG:  Yes.  Well, I am not sure -- we

22  were just looking at something but in terms of what he'll

23  get credit for, it will be May 21st, 2013.  The BOP will

24  give him credit up until that point, unless he had also

25  been arrested --

63

Proceedings

1          MR. GJELAJ:  No, he was not.

2          MR. ROSENBERG:  Okay.  So that's when his clock

3    begins with respect to the BOP on your sentence, your

4    Honor.

5          THE COURT:  So does he lose anything?  I mean

6    he's claiming that --

7          MR. ROSENBERG:  That's my concern, that he

8    doesn't lose anything.  Exactly.

9          THE COURT:  Yeah.

10          MR. ROSENBERG:  If that could be in the

11    judgment, that would be great, so that would give me a

12    lot of --

13          THE COURT:  Put it in the judgment.

14          THE CLERK:  What was the date again, Mr.

15    Gjelaj?

16          MR. GJELAJ:  It is May 21st, 2013.

17          MS. MERKL:  Your Honor, that's the arrest date

18    on the PSR.  In the government's experience, when these

19    sentences are in the same -- some of the same criminal

20    conduct that's alleged in the RICO that he was already

21    convicted of, which is the government's reason for

22    agreeing completely that they needed to be concurrent

23    time.

24          There's no reason to believe that the

25    sentencing computation folks in Texas are going to mess

64

Proceedings

1   this up.  I mean that just hasn't been our experience,

2   and if that were to occur, the defendant can bring it to

3   our attention in the form of a 2241.

4            MR. ROSENBERG:  Well, I'm trying to avoid 2241.

5            THE COURT:  Well, what we're talking about is

6   just making it clear, to --

7            MS. MERKL:  Yeah, that's fine, too.  I just --

8            THE COURT:  Yeah.

9            MS. MERKL:  -- I don't think that he deserves

10  time off.

11           THE COURT:  No.  His premise for time off was

12  that he wouldn't get credit.

13           MS. MERKL:  Right.

14           THE COURT:  So where are we now?

15           MR. ROSENBERG:  So where we are, Judge, the

16  sentence that Mr. Odilon is now serving, 262 months,

17  falls right in the middle, if you will, of the sentencing

18  advisory range, and the five years that he spent in jail

19  has been already a life changing event obviously for

20  Odilon, and in my memo, I did mention his background, and

21  his growing up in poverty, and the culture that he grew

22  up in.  It's not to excuse it.  I quoted the famous

23  street artist, JR, "What we see changes who we are.

24           To what extent that contributed to Odilon's

25  decision making or lack of fortitude to avoid going into

65

Proceedings

1   this type of business, we can't know.  But we do know

2   that he has great remorse, and regret, as I pointed out

3   in my sentencing submissions, and he had time to think

4   about the contrast between the love that he has for his

5   own daughters, and female members of his family, and the

6   way that these offenses occurred, it's stark contrast.

7         And it's given him time to reflect and quite

8   frankly, move to a better place in his head, and in the

9   way he approaches life.  He will not -- with his current

10  sentence, he will not be released until he is in his 60s.

11  He's 47-years-old now.

12        THE COURT:  His current sentence is 252 months?

13        MS. MERKL:  262.

14        MR. ROSENBERG:  262; 21 years, 10 months.  He's

15  been in jail now for approximately more than five years.

16  As I say, it's has been life changing, and we're not

17  minimizing this conduct at all.  We recognize the

18  seriousness of -- he does, as well.  There's very little

19  that a defendant can do to prove their remorse and their

20  regret, but I can assure your Honor, five years of being

21  away from family, of being -- he doesn't even have email

22  privileges for whatever reason that the Bureau -- that

23  they just decided not to allow him to have.

24        So he's had no family contact.  The five years

25  that he spent in jail in this country is the only

66

Proceedings

1  physical contact he's had with family is -- are his

2  co-defendants.  And there is, as your Honor can see,

3  family members back in Mexico who have great affection

4  for him, but he has not been able to see them, and to

5  have normal, familial relationships, and that's what

6  makes this sentence a -- he's a stranger in a strange

7  land, and separated from family, a much more difficult

8  sentence, a much more difficult term of imprisonment.

9          So this is not a situation, as my colleague had

10 mentioned yesterday.  He's not going to be eligible for

11 early release from halfway houses, or take advantage of

12 many programs that are offered by the Bureau of Prisons.

13         He first has to face deportation proceedings

14 when there's 262 month sentence as it stands now, even as

15 it stands now, is complete.  So this has been just an

16 overall, overarching conspiracy, Georgia and here.  It's

17 a case where multiple victims, multiple jurisdictions

18 with all the defendants, not just him.

19         And so in asking for a concurrent sentence,

20 your Honor, I would ask for a sentence of no more than

21 262 months in this case, to run concurrent with his

22 present sentence.  It is the same, if you will,

23 overarching conspiracy.  It's again, he'll be released

24 from jail at an ge when recidivism is statistically

25 lessened, and again, a five-years that he's had in his

67

Proceedings

1  head, not only a specific deterrence, but I'm quite

2  certain the sentence that he's received already has had a

3  general deterrence, if such is in fact measurable.

4          So there's certainly nothing that would offend

5  the sentence of justice for him to receive a sentence

6  that -- of 262 months or less would not be offended --

7  offend the sentence of justice, your Honor, or be

8  contrary to the sentencing goals under the statute.

9          THE COURT:  Do you wish to speak?  Do you wish

10  to speak?

11          DEFENDANT ODILON MARTINEZ-ROJAS:  Yes.  I want

12  to apologize to your Honor.  I want to apologize, your

13  Honor, to the U.S. Attorney's Office of the United

14  States, and also to the victims.  And while I am

15  remorseful because with these five years that I have

16  already spent in prison, I want to well, re-enter

17  society.  That's all.

18          MS. MERKL:  Your Honor, it's the government's

19  understanding that one of the victims in the video link

20  to Georgia would like to be heard.  This is victim

21  initials MSJ, your Honor.

22          THE COURT:  And where is she referred to in the

23  presentence report?

24          MS. MERKL:  In the presentence report, your

25  Honor, she is identified under those initials.  I will

68

Proceedings

1   locate the paragraphs.

2              MR. GJELAJ:  She is not a Jane Doe.

3              MS. MERKL:  She is a victim of the defendant,

4   your Honor, and she is identified in paragraphs 43, 44,

5   45, and 46, MSJ.

6              THE CLERK:  MSJ?  We're on the record.

7              MSJ:  Good afternoon.  I am MS (sic).  Yes.  I

8   want to tell your Honor that to consider and to be fair

9   to give him what he deserves because they're not

10  suffering --

11             THE CLERK:  You need to wait for the

12  interpreter to finish interpreting for you before you

13  continue.  I am sorry.

14             MSJ:  Okay.  Because they haven't suffered the

15  minimum part of what we have that they're -- because

16  they're not suffering anything at all by comparison to

17  what we suffer, and I believe that God and you are able

18  to do justice for us, because thanks to them --

19             THE INTERPRETER:  Interpreter needs

20  clarification.

21             MSJ:   That because of all that I have -- after

22  all that I have suffered through, I suffered from many

23  panic attacks.  I cannot have a marital relationship with

24  my husband because I always remember the things I went

25  through, and I implore -- and they ask for forgiveness,

Transcriptions Plus II, Inc.

69

Proceedings

1   but I pray to God to help me to forgive them, but I just

2   can't.

3           I believe your Honor, you have to be fair and

4   leave them in there because as soon as they come out, Mr.

5   Severiano tried to abuse from me.  I don't know if you

6   remember and was inside his trailer, he threw me on the

7   floor, and he told me that he would teach me how to serve

8   the clients because Jonathan (ph.) hasn't taught me to do

9   it well.

10          And he was going to teach me how to yell, and

11  the girl came who lived with him, and he was unable to do

12  it.  I swear that I didn't want to do everything that

13  they wanted me to do, and I did it because I didn't have

14  a choice.  That is all.  There is much more left.

15          MS. MERKL:  But she can't anymore.

16          THE INTERPRETER:  But she can't anymore.

17          THE COURT:  Thank you.

18          MS. MERKL:  Your Honor, I would also --

19          THE CLERK:  Severiano could be seated.

20          MS. MERKL:  And I would also note that that

21  victim victim's impact statement filed in the Georgia

22  case was also included as Exhibit C to the government's

23  sentencing memorandum.

24          THE COURT:  Is there anything that she didn't

25  say that's in there?

70

Proceedings

1          MS. MERKL:  I'm sorry?

2          THE COURT:  Is there anything in the Exhibit C

3   that she did not discuss or that's not in the presentence

4   report?

5          MS. MERKL:  No, your Honor.  The Exhibit C

6   describes some of the same harms she just described,

7   including her -- and her difficulty in having a normal

8   marital relationship, and how she has been seeing a

9   psychologist to have the strength to move forward.

10         She's described that she's fearful in the event

11  that the defendants get out of jail, fear that they will

12  come for her family, and for her, and how she suffers

13  from panic attacks when she thinks about their release

14  from prison.

15         She also stated in her victim impact statement

16  that "Those people cannot even pay for all the pain that

17  they caused me, or all of the other innocent women by

18  going to jail, innocent women like me who were tricked

19  into believing something, and then had that dream broken.

20  They should be put away for life, a very long sentence,

21  so that they can see what it feels like to be locked up

22  like I was.  I was never in agreement with selling my

23  body.  They forced me to do this, and I was a virgin at

24  the time when they forced me.  My dream had always been

25  to only be with one man, and did not end up like that for

71

Proceedings

1   me.  They ruined my life, and I will never be the same."

2            So that's MSJ, your Honor.  In addition MSJ

3   spoke at the proceeding before Judge Totenberg.  The

4   transcript of the victim impact statements at that

5   sentencing are included in the government's submission at

6   Exhibit 5.

7            And that, your Honor, I would like to give

8   voice to Jane Doe's 4 victim impact statement. Oh, I'm

9   sorry, your Honor, Jane Doe 4 has just texted that they

10  would like to -- somebody from Georgia has texted that

11  Jane Doe 4 would like to speak as well.

12           THE COURT:  I need to take a two-minute break

13  before she starts.  I'll be right back.

14           MS. MERKL:  Thank you, your Honor.

15           THE CLERK:  We're going to take a two-minute

16  break.

17  (Pause)

18           THE CLERK:  We're back on the record, counsel.

19  Resuming with Odilon.

20           MS. MERKL:  Your Honor, just prior to the

21  break, we received word from the video link in Georgia

22  that the victim alternatively identified as Jane Doe

23  Number 4, and SAM, would like to make a victim impact

24  statement.  She is referred to in Odilon Martinez-Rojas'

25  PSR as Jane Doe 4, your Honor, and that's at paragraph

Proceedings

1  20.

2           THE CLERK:  Jane Doe Number 4?

3           MS. MERKL:  SAM?

4           JANE DOE 4-SAM:  Good afternoon.  My name is

5  SAM.  I would like to say something to the judge.  I

6  would like Odilon and Severiano to receive everything

7  (indiscernible), of all of the -- the full weight of the

8  law because I think about all the harm, the harm that

9  they did to us.  They're asking for forgiveness.  He's

10  asking for forgiveness because the five years that he

11  spent, he hasn't spent them very well.

12           I would like Odilon to know I am not the same

13  as what we are going to be living for the rest of our

14  lives, and I hope that the judge will be fair because of

15  all of the harm that they have done to us.

16           If it were up to me, they would never get out

17  because they will serve their sentence, and then they

18  will get out but the wounds and the traumas that we live

19  through, we will never forget them.  He's asking for

20  forgiveness, but I will never ever forgive him.  That's

21  all.

22           THE COURT:  Thank you.

23           MS. MERKL:  Your Honor, just to complete the

24  record, I would note that the typed victim impact

25  statement submitted by that Jane Doe is included in the

73

Proceedings

1   government's sentencing submission at Exhibit B, and her

2   prior statement at the prior sentencing of Odilon

3   Martinez-Rojas is included as Exhibit F, pages 80 to 81

4   of the transcript from the Northern District of Georgia.

5            So your Honor as to Odilon Martinez-Rojas, the

6   government is requesting a sentence at the high end of

7   the applicable guidelines range.  As the Court knows, he

8   is already serving a sentence of 262 months for the

9   victimization of SAM, from whom you've just heard, and

10  two additional one women, one of whom you've heard from

11  today.

12           In addition to those victims, your Honor, he's

13  responsible for two more victims that he personally

14  recruited to bring to this country, in addition to the

15  assisting of trafficking, at least three more as to whom

16  the evidence is set forth in the PSR.

17           To sentence him to the same sentence he

18  received in Georgia would deny justice to those

19  additional victims, your Honor, and it is inappropriate,

20  and is for that reason that we ask for a sentence at the

21  highest end of the range applicable to this defendant.

22           He more than deserves a sentence of 293 months,

23  and I would respectfully submit that that is the

24  appropriate sentence, given the way that the guidelines

25  calculated in his case.

74

Proceedings

1        THE COURT:  Now there are instances in which he

2  physically personally assaulted several of the victims.

3  Are those the same as in Georgia or are they different?

4        MS. MERKL:  Your Honor, those are additional

5  victims.  So Jane Doe 1 is new to this case, and her

6  victim impact statement, your Honor, is included at

7  Exhibit A.  Jane Doe 1 is the individual who was working

8  in the store when she had three young children, and was

9  recruited to come to the United States, sent to work with

10  no guidance as to what the nature of the work would be.

11  When she didn't know how to proceed, and did not perform

12  the work in any kind of fashion because she didn't know

13  how to be prostitute, she was brought back to Odilon's

14  custody and he beat her, raped her, had a female

15  associate inject her with unknown substances on more than

16  one occasion that made her feel groggy.  She was beaten

17  so badly, she -- you know, on more than one occasion,

18  that it interrupted her work.

19             In addition your Honor, this defendant

20  threatened her son, and he threatened her on multiple

21  occasions.  So Jane Doe 1 is a completely different

22  victim than was presented to the Court in Georgia, your

23  Honor.

24             Same thing, your Honor, as to Jane Doe 9.  Jane

25  Doe 9 was not a part of the sentencing in the Georgia

75
Proceedings

1  case, and in addition to being involved in the

2  trafficking of Jane Doe 9, he threatened Jane Doe 9 to

3  prevent her cooperation of law enforcement at the very

4  beginning of this case when he was first arrested in

5  Georgia.

6          So to account for the additional victimization,

7  and aiding and abetting his co-conspirators as to Jane

8  Does 5, 6 and 7, and the threats to Jane Doe 9, an

9  additional -- a lengthier term of imprisonment than was

10  imposed in Georgia is appropriate.

11          THE COURT:  So the guidelines are 236 to 293.

12          MR. ROSENBERG:  Yes.

13          THE CLERK:  Correct.

14          THE COURT:  I'm going to sentence the defendant

15  to the custody of the Attorney General for a period of

16  293 months.  I basically agree with Ms. Merkl as to why

17  this should be a sentence at the top of the guidelines

18  range, and not (sic) run concurrently with the sentence

19  in Georgia.

20          MR. ROSENBERG:  To run concurrently.

21          THE COURT:  To run concurrently, not -- I meant

22  to say not consecutively.  And let's see -- and five

23  years supervised release with the following conditions,

24  that if the defendant is removed, he not reenter the

25  United States illegally.  The defendant shall not

Proceedings

1   cooperate with, and abide by all instructions -- shall

2   cooperate with, and abide by all instructions of

3   immigration authorities, shall comply with any potential

4   restitution and forfeiture orders.  Upon request the U.S.

5   Probation -- upon request, the defendant shall provide

6   the U.S. Probation with a full disclosure of his

7   financial records, including commingled income, expenses,

8   assets and liabilities, to include yearly income tax

9   returns, with the exception of a financial accounts

10   reported, and noted within the presentence report.

11         The defendant is prohibited from maintaining or

12   opening any additional and/or joint checking, savings, or

13   other financial accounts for either personal or business

14   purposes without the knowledge and approval of the U.S.

15   Probation Department.

16         The defendant shall cooperate with the

17   probation officer in the investigation of his financial

18   dealings, and shall provide truthful monthly statements

19   of his income and expenses.  The defendant shall

20   cooperate in the signing of any necessary authorizations

21   to release information forms, permitting the U.S.

22   Probation Department to access his financial information

23   and records.  The defendant shall comply with any

24   applicable state, and/or federal sex offender

25   registration requirements as instructed by the probation

Proceedings

1  office, or the Bureau of Prisons, or any state offender

2  registration agency in the state where he resides, works

3  or is a student.  And I also impose a special assessment

4  of $200.

5          THE CLERK:  Counsel, do you also 45 days in

6  which to address the restitution?

7          MR. ROSENBERG:  Yes, please.

8          THE CLERK:  Disposition of remaining counts or

9  underlying indictments?

10          MS. MERKL:  Your Honor, the government moves to

11  dismiss any open counts in the underlying indictment.

12          THE COURT:  They're dismissed.

13          THE CLERK:  Has your client waived his right to

14  appeal in the plea agreement?

15          MR. ROSENBERG:  Less than 327, yes.

16          THE CLERK:  Thank you.

17          MR. ROSENBERG:  Your Honor, if you can, Mr.

18  Odilon needs some attention, medical attention at the

19  jail.  He's been complaining about bleeding -- rectal

20  bleeding?

21  (Counsel and client confer)

22          MR. ROSENBERG:  It's okay now.  And the other

23  thing is, I would request that --

24          THE COURT:  He's complaining about rectal

25  bleeding, you said?

78

Proceedings

1          MR. ROSENBERG:  I think it's -- translate,

2    please.

3    (Counsel and client confer)

4          MR. ROSENBERG:  Okay.  I understand since I

5    have -- it's being attended to, your Honor, so you need

6    not include that in your judgment, as far as medical

7    attention.  But I would make a request that a

8    recommendation to the Bureau of Prisons that he be

9    designated to a jail with Severiano, his brother.  Again,

10   he has no family in this country.

11         THE COURT:  I will make that recommendation.

12         MR. ROSENBERG:  All right.

13         THE COURT:  Okay?

14         MR. ROSENBERG:  Okay.

15         THE CLERK:  And this defendant is unable to pay

16   a fine, Judge?

17         THE COURT:  No, he can't pay a fine.

18         THE CLERK:  Thank you, Judge.

19         You can sit down.  Can you bring Severiano up,

20   please?

21   (Pause)

22         THE CLERK:  Proceeding with the individual

23   sentencing of Severiano, Judge.

24         MR. WALLENSTEIN:  Your Honor, I think that

25   Severiano has expressed to your Honor in a letter which I

79

Proceedings

1  presume you've gotten in my supplemental submission, that

2  expresses his remorse for what he has done.  And he says

3  specifically in that letter, that "During the time I have

4  been incarcerated, I have come to realize the evil that I

5  have committed, and I have come to the conclusion that I

6  was very wrong, and also very remorseful.  I want you to

7  know that I agree to whatever time you will give me, and

8  that I need to correct my errors and my defects."

9        He'd like to study, and turn himself into a

10  better human being by the time he gets out.  He is 54-

11  years-old. There is a mandatory minimum sentence here of

12  15 years, as you know.  The guidelines, as you know, are

13  235 to 293, and I am well aware of what your Honor has

14  sentenced the other defendants in this case to since I

15  have been here for two days listening to your Honor

16  impose those sentences.

17        So I have a fair idea of what I think you're

18  going to do, and I would simply ask you to sentence him

19  at the low end of the guidelines.  I think that the

20  sentence of 235 or 240 months is more than sufficient to

21  serve the aims of sentencing, and to punish the defendant

22  certainly.

23        He will not have an opportunity for

24  rehabilitation, as many prisoners do because he is not a

25  citizen, because he has no status in this country having

Proceedings

1   been brought here under arrest through an extradition

2   order, so he will not be eligible for any of the programs

3   that the Bureau of Prisons would otherwise make available

4   to him.

5           So he's essentially going to be warehoused for

6   the next 20 years.  Now how that plays out in terms of

7   his mental health, I couldn't begin to think.  I've heard

8   the victim statements.  This was a horrendous crime, and

9   he is truly remorseful for what he's done.  I've had

10  many, many discussions with him over time.

11          So I ask your Honor to be as merciful as you

12  possibly can, and to sentence him, as I said, at the low

13  end of the guidelines range.

14          THE COURT:  Do you wish to speak?

15          DEFENDANT SEVERIANO MARTINEZ-ROJAS:  Before

16  anything else, your Honor, I would like to thank you for

17  allowing me to express my apologies.  During the time

18  that I've been here in jail, I'm trying to change, change

19  more, because the harm that I have done, I've come to the

20  conclusion that I -- what I did was wrong.

21          I am sorry.  I apologize a thousand times over.

22  to the United States, to the judge, to the victims, and

23  to everyone who is here right now.  Once again, thank

24  you.

25          MS. MERKL:  Your Honor, we recently heard from

81

Proceedings

1   some of the victims affected by this defendant's conduct

2   by two of the survivors who are with us via the video

3   telelink, SAM and MSJ, and as MSJ described, your Honor,

4   this defendant attempted to rape her in an effort to

5   train her on how to be a better prostitute upon his

6   conclusion that her trafficker, who she referred to as

7   Jonathan had not done an adequate job.

8           Your Honor, this defendant operated a brother

9   trailer in Alabama, and in that capacity was involved in

10  the victimization of many of the women in this case, as

11  set forth in the PSR.  The guidelines, the grouping

12  analysis, the multiple count analysis in this case,

13  capped out.  There are victims here in this defendant's

14  guidelines analysis that don't even "count" for

15  guidelines purposes, your Honor.

16          And as a result of that, and as a result of his

17  horrific conduct over years, including the attempted rape

18  of MSJ, the verbal abuse of all of the victims he

19  encountered, his attempted rape of -- his actual rape,

20  excuse me, of Jane Doe 1 that your Honor read about

21  earlier today, it's the government's position that the

22  top end of the guidelines range --

23          THE COURT:  He also told Rojas-Quijotal to cut

24  FFB (sic) in her face, according to the presentence

25  report.

82

                    Proceedings

1          MS. MERKL:  FBF, your Honor.

2          THE COURT:  I'm sorry.

3          MS. MERKL:  Absolutely.  that's -- absolutely,

4    your Honor.  So the sum total of the defendant's conduct

5    here --

6          THE COURT:  And he may have gone onto beat her

7    because he was directed to by Odilon.

8          MS. MERKL:  Agreed.  And the sum total of this

9    defendant's conduct, your Honor, that over a span of

10   years, he brutalized -- brutally victimized multiple Jane

11   Does, including Jane Doe 1, SAM, Jane Doe 7, who he

12   personally recruited and trafficked, MSJ, who we just

13   heard from, FBF, and there's no question in the

14   government's mind, your Honor, that his conduct was as

15   culpable, if not more culpable than his brother Odilon.

16   And although the guidelines shake out to the same level,

17   it is the government's position that similar to his

18   brother, he should be sentenced at the highest end of the

19   applicable guidelines range here, as it more

20   appropriately takes into consideration all of that

21   offense conduct than any other sentence within the

22   guidelines range.

23          THE COURT:  All right.  I'm going to sentence

24   the defendant to the custody of the -- I agree that this

25   is -- with Ms. Merkl's analysis, and I'm going to

                  Transcriptions Plus II, Inc.

83

Proceedings

1    sentence the defendant to the custody of the Attorney

2    General for a period of 293 months.  The custody to run

3    concurrent on all counts.  Five years supervised release

4    with the following special condition, that if removed,

5    the defendant may not reenter the United States

6    illegally.  The defendant shall cooperate with and abide

7    by all instructions of immigration, shall comply with any

8    potential restitution and forfeiture orders.  Upon

9    request, the defendant shall provide the probation

10   department with full disclosure of his financial records,

11   including commingled income, expenses, assets and

12   liabilities, to include yearly income tax returns, with

13   the exception of the financial accounts, reported and

14   noted within the presentence report.

15           The defendant is prohibited from maintaining

16   and/or opening any additional individual and/or joint

17   checking, savings, or other financial accounts, for

18   either personal or business purposes without the

19   knowledge and approval of the probation department.

20           The defendant shall cooperate with the

21   probation office, or in the investigation of his or her

22   financial dealings, and shall provide truthful monthly

23   statements in his income -- of his income and expenses.

24   The defendant shall cooperate in the signing of any

25   necessary authorization to release information forms,

84

Proceedings

1   permitting the U.S. Probation Department access to his or

2   her financial information.

3           The defendant shall comply with any applicable

4   state, and/or federal offender registration requirements

5   as instructed by the probation officer, by the Bureau of

6   Prisons or any state offender registration agency in the

7   state where he resides, works, or is a student.

8           I also impose a $300 special assessment.

9   (Pause)

10          MS. MERKL:  He had one count of Georgia.

11          THE CLERK:  $300, Judge, right?

12          THE COURT:  That's what -- you know, that part

13  I -- he pled to three counts, I assume it's three --

14          THE CLERK:  I'm just confirming.

15          MS. MERKL:  He did plead to two counts in the

16  Eastern District indictment, and one count in the

17  Northern District of Georgia indictment, your Honor.

18          THE COURT:  So what do I give the special

19  assessment -- oh, yeah.

20          MS. MERKL:  You're correct.

21          THE COURT:  This was Rule 20'd.

22          MS. MERKL:  Yes, yes.

23          THE COURT:  Yes.  Okay.

24          MR. ROSENBERG:  But we have two separate

25  indictment numbers here, so I don't know whether you have

85

Proceedings

1   to do $200 on one, and $100 on the other.  And I leave

2   that all to Paula.

3           THE CLERK:  I'm going to put both indictments

4   on the same judgment.

5           MR. ROSENBERG:  Okay.

6           THE CLERK:  Disposition of remaining counts and

7   underlying indictments?

8           MS. MERKL:  Your Honor, the government moves to

9   dismiss all open counts in the underlying indictment in

10  the Eastern District case.  I do not believe there is an

11  underlying indictment in the Northern District case, but

12  if there is, it was not transferred here.

13          THE COURT:  Okay.  Motion is granted.

14          MR. ROSENBERG:  Okay.

15          THE CLERK:  And has your client waived his

16  right to appeal in the plea agreement, counsel?

17          MR. ROSENBERG:  He has waived his right to

18  appeal any sentence of less than 327 months.  However,

19  should he contact me in the next 14 days, I will file a

20  notice on his behalf if that's what he wants.

21          With respect to recommendation, I concur in Mr.

22  Rosenberg's request that Severiano be designated to the

23  same facility as his brother Odilon, recognizing that

24  your Honor can only make a recommendation but I ask you

25  to do so.

Proceedings

1    And I also ask that designate them both, or

2 recommend that they be designated to a facility in Texas,

3 Arizona or New Mexico, as that is -- might facilitate

4 family visitation over the next 25 years.

5    THE COURT:  We should probably do that on all

6 of them, in terms of the location of the --

7    THE CLERK:  Sure, Judge.

8    THE COURT:  -- place of confinement.

9    THE CLERK:  You also have 45 days in which to

10 address the restitution issue?

11    MR. ROSENBERG:  Yes, please.

12    THE CLERK:  Okay. Judge, I assume the same

13 finding of inability to pay a fine for this defendant, as

14 well?

15    THE COURT:  Yes.

16    THE CLERK:  Thank you very much, counsel.

17    MR. ROSENBERG:  Thank you, Judge.

18    THE CLERK:  Government, and probation

19 (indiscernible) January 15th.

20    MS. MERKL:  Thank you very much, Judge.

21    MR. ROSENBERG:  Thank you, your Honor.

22    MR. WALLENSTEIN:  Thank you.

23    MR. ROSENBERG:  Have a good weekend.

24    MS. LEE:  Thank you, Judge.

25    MS. MERKL:  Have a good weekend, everybody.

87

Proceedings

1        And thank you, Georgia.

2        UNIDENTIFIED SPEAKER:  Pardon?

3        THE CLERK:  We're done.

4        MS. MERKL:  We're done.

5        THE CLERK:  Thank you very much.

6            (Matter Concluded)

7                -o0o-

88

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **3RD** day of **December**, 2019.

*Linda Ferrara*

Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.